El Juez Asociado Señor Feliberti Cintrón
emitió la opinión del Tribunal.
El presente recurso nos brinda la oportunidad de expre-sarnos en torno a las facultades concedidas a las Oficinas Municipales de Permisos, en virtud de la Ley de Munici-pios Autónomos de Puerto Rico de 1991 (Ley de Municipios Autónomos),([1]) para atender asuntos concernientes a per-misos de uso, anteproyectos y permisos de construcción, entre otros, dentro de sus lindes territoriales. Específica-mente nos corresponde determinar si al evaluar una Con-sulta sobre Conformidad con el Reglamento de Zonificación de Puerto Rico (Reglamento de Zonificación),([2]) aprobado *804 por la Junta de Planificación de Puerto Rico (Junta de Pla-nificación), con el fin de establecer un comercio en un área de facilidades vecinales de una urbanización, dichos orga-nismos municipales tienen la discreción de tomar en cuenta factores y políticas de ordenación territorial según establecidas mediante legislación, así como reglamenta-ción promulgada por la Junta de Planificación, por la Ad-ministración de Reglamentos y Permisos (A.R.Pe.)([3]) y por el propio municipio, o si están obligados a otorgar los per-misos de forma ministerial por el mero cumplimiento de la parte concernida con los criterios del distrito del que se trate.
En el caso ante nos, el Municipio Autónomo de Carolina aduce que tiene discreción para evaluar detenidamente y determinar si procede la aprobación de la referida consulta. El dueño del predio y el arquitecto que desarrolló la propuesta alegan que dicho municipio está obligado a aprobar su consulta ministerialmente, puesto que, según estos, el proyecto propuesto cumple con los criterios de zo-nificación aplicables al predio en cuestión.
I
De entrada, es preciso señalar que, a pesar de que el predio objeto de la controversia ante nos aparece calificado como Distrito Residencial 3 (Distrito R-3), este está desti-nado para facilidades vecinales y usos accesorios, por lo que la consulta propuesta debe ser evaluada conforme a los criterios pautados para un Distrito Comercial de Servicios Vecinales (Distrito C-6). Conforme al Reglamento de Zoni-ficación, los Distritos R-3 son distritos que “se establece [n] para clasificar áreas residenciales ... en donde se permiti- *805 rán diferentes tipos de viviendas en solares de trescientos (300) metros cuadrados o más”. Sec. 13.01 del Reglamento de Zonificación, pág. 73. Por otro lado, los Distritos C-6 “se establece [n] para clasificar las facilidades comerciales de-sarrolladas conforme a los requerimientos del Reglamento sobre Lotificación y Urbanizaciones ...”. Sec. 26.01 del Re-glamento de Zonificación, pág. 127.
Teniendo como trasfondo los conceptos de zonificación definidos, pasamos a pormenorizar los hechos que dan lu-gar al recurso antes nos.
El 10 de abril de 2001 el Arq. Daniel Frías y The Sem-bler Company of Puerto Rico (Sembler o los recurridos) presentaron una Solicitud de Consulta sobre Conformidad con el Reglamento de Zonificación, Solicitud Núm. 01-762-A (Consulta sobre Conformidad)/[4]) al Gobierno Municipal Autónomo de Carolina (Municipio) y a la Oficina Municipal de Permisos Urbanísticos (OMPU) (en conjunto, los peticionarios). Mediante esta solicitud proponían la cons-trucción de un edificio comercial de 16,800 p2 para ubicar una tienda de venta al detal para la empresa Walgreens. Dicha edificación habría de ser erigida en un predio de 7,887 m, de los 14,866 m2 que formaban parte de un área reservada para servicios vecinales y usos accesorios de la Urbanización Villa Carolina, Tercera Sección, Etapa D/[5]) *806 Sin embargo, luego de la correspondiente evaluación, el 14 de junio de 2001 la OMPU emitió una Resolución en la que denegó dicha solicitud.
En su determinación, la OMPU señaló que la propiedad donde se proponía la construcción del proyecto era un área destinada para usos accesorios de la Urbanización Villa Carolina y que estaba zonificada como Distrito R-3. Sos-tuvo que, de acuerdo con el Reglamento de Zonificación, no está permitida la operación de tiendas de ventas al detal en distritos zonificados como R-3. Además, indicó que la Oficina de Planificación del Municipio Autónomo de Carolina (OPMAC) no había dado su endoso al proyecto y que, por lo tanto, el Comité de Permisos del Municipio recomen-daba que se denegara la Consulta sobre Conformidad. A pesar de que la Resolución resulta un tanto escueta en cuanto a los fundamentos que dieron base para la denega-toria del proyecto, en ésta se indica que, tanto la OPMAC como su Comité de Permisos, habían realizado una evalua-ción del proyecto en cuestión dentro del marco de su espe-cialización y habían recomendado denegarlo.
Inconformes con tal determinación, los recurridos solici-taron a la OMPU la reconsideración de su Resolución el 5 de julio de 2001. No obstante, dicha solicitud fue rechazada de plano el 8 de agosto de 2001.
Así las cosas, el 10 de agosto de 2001 Sembler presentó un escrito de apelación ante la otrora Junta de Apelaciones de Construcciones y Lotificaciones (JACL).([6]) En éste plan- *807 teó que el predio objeto de la Consulta sobre Conformidad, a pesar de estar zonificado como Distrito R-3 tiene, a su vez, una clasificación de usos accesorios, por lo que, con-forme al Reglamento sobre Facilidades Vecinales aprobado por la Junta de Planificación,([7]) se contemplaba, igual-mente, el establecimiento de comercios. Añadió que el Municipio había aprobado los permisos para dos establecimientos de comida (Wendy’s y Sizzler) ubicados en esa misma área,([8]) por lo que correspondía actuar de igual forma y aprobar ministerialmente su Consulta sobre Conformidad.([9])
Tras varios trámites procesales ante la JACL, inclu-yendo la presentación de un Informe de Conferencia Preli-minar entre Abogados, el 1 de agosto de 2005 se celebró una vista administrativa. Allí, las partes informaron al mencionado foro que, en ausencia de controversias de he-chos que requirieran ser dirimidas, entendían que los plan-teamientos de derecho podían resolverse mediante la pre-sentación de memorandos por ambas partes. La JACL expresó su anuencia a lo solicitado por las partes y conce-dió un término para que éstas presentaran sus memoran-dos simultáneamente.
En su memorando, Sembler reprodujo los planteamien-tos esgrimidos en todos sus escritos previos ante la JACL, a los efectos de que la aprobación del proyecto procedía de forma ministerial ya que, presuntamente, éste cumplía con todos los requisitos aplicables al Distrito C-6. Insistió, ade-más, en el hecho de que los terrenos donde se proponía la *808 construcción de la tienda Walgreens para la venta de artí-culos al detal estaban clasificados para usos accesorios, por lo que estaba autorizado el establecimiento de comercios.
Por su parte, el Municipio y la OMPU expusieron en su memorando de derecho que, aun cuando reconocían que al estar el predio clasificado para usos accesorios, donde se permitía el uso comercial, ellos poseían discreción para de-negar o determinar la incompatibilidad de proyectos to-mando en consideración y evaluando diversos criterios aplicables a dichos predios. Sostuvieron que la reglamen-tación relevante al desarrollo de dichos terrenos les concede facultad para determinar el tipo de comercio a ubi-carse, “tomando en consideración la magnitud, tipo, naturaleza o localización de dicho proyecto, las vías de tránsito existente[s] y propuestas, así como la existencia de otros negocios establecidos”. Manifestaron que, a pesar de que los reglamentos concernientes vislumbraban el desa-rrollo de tiendas de ventas al detal en las áreas destinadas para servicios vecinales, el proyecto bajo su evaluación era de una naturaleza, finalidad y envergadura totalmente distinta a los objetivos que se pretendían alcanzar en los predios en cuestión. Explicaron que esto, unido al conjunto de políticas públicas atinentes a la planificación urbana y a la falta de endoso por parte de la OPMAC, fue lo que los llevó a denegar la Consulta sobre Conformidad.
El 26 de septiembre de 2006 la JACL emitió una Reso-lución, revocando la denegatoria de la OMPU. Basó su de-terminación estrictamente en cuestiones de zonificación, enfatizando que el Municipio había errado al utilizar en su evaluación criterios concernientes a un Distrito R-3, cuando el predio en cuestión era “comercial”. Ajuicio de la JACL, Sembler cumplió con la reglamentación vigente.
Considerando errada la determinación de la JACL, el 26 de octubre de 2006 los peticionarios sometieron un recurso de revisión administrativa ante el tribunal apelativo intermedio. Sostuvieron, al igual que lo habían hecho ante *809 la OMPU, que el proyecto de los recurridos —de establecer una tienda de ventas al detal para la cadena Walgreens— no cumplía con los objetivos que se pretendía alcanzar al destinar dicho predio como un área de facilidades vecinales y usos accesorios, tomando en consideración la naturaleza, finalidad y envergadura del predio. Alegaron que la deter-minación de la JACL, al revocar su denegatoria y autorizar la Consulta sobre Conformidad, era arbitraria e irrazona-ble, puesto que únicamente se había tomado en considera-ción si el comercio que se establecería cumpliría con las disposiciones relativas a los Distritos C-6. Asimismo, sos-tuvieron que una evaluación completa del derecho aplica-ble requería, igualmente, la consideración de las disposi-ciones de la Ley Núm. 25 de 8 de junio de 1962, según enmendada, 23 L.P.R.A. sec. 30a et seq. (Ley 25), los regla-mentos de la Junta de Planificación aplicables y las políti-cas públicas contenidas en el Plan de Usos de Terrenos de Puerto Rico, el Plan de Usos de Terrenos de la Región Me-tropolitana de San Juan y el Plan de Ordenación Territorial de Carolina, directrices que ellos habían aquilatado al emitir su decisión. Por lo tanto, solicitaron al Tribunal de Apelaciones que revocara y dejara sin efecto la determina-ción de la JACL.
El 10 de enero de 2007 los recurridos presentaron su alegato en oposición al recurso de revisión administrativa. Señalaron que tanto en el Plano de Inscripción de la Urba-nización Villa Carolina como en el Mapa de Zonificación del Municipio, el predio en cuestión aparecía clasificado como para usos accesorios. Por lo tanto, sostuvieron que según las disposiciones del Reglamento sobre Facilidades Vecinales, dicha propiedad debía ser destinada, entre otros propósitos, para el establecimiento de facilidades comerciales. Además, dado que el proyecto propuesto cum-plía con las disposiciones de dicho reglamento, la autoriza-ción de la Consulta sobre Conformidad procedía de forma ministerial.
*810 El Tribunal de Apelaciones confirmó la Resolución recu-rrida mediante Sentencia emitida el 24 de enero de 2007. Fundamentó su determinación, principalmente, en la defe-rencia concedida a las decisiones administrativas.
No conformes aún con dicho dictamen, el 13 de febrero de 2007 los peticionarios presentaron una Moción de Re-consideración ante dicho foro. Sin embargo, ésta fue decla-rada no ha lugar el 22 de febrero del mismo año. Los peti-cionarios acuden ante nos de esa determinación, planteando como único señalamiento de error lo siguiente:
Erró el Tribunal de Apelaciones ... al autorizar un proyecto QUE ES DEFINITIVAMENTE CONTRARIO A LA NORMATIVA QUE, RESPON-DIENDO A PROPÓSITOS ESTATUTARIOS Y DE PLANIFICACI [Ó] N URBANA, INS-TITUYE Y RIGE LOS PREDIOS PARA FACILIDADES VECINALES COMERCIALES Y a la propia Resolución de la Junta de Planificación sobre la DISTRIBUCIÓN Y USO A DARSELE A LOS PREDIOS DE FACILIDADES VECINA-LES de la Urb. Villa Carolina, Tercera Sección, Etapa D, al aprobarse el desarrollo de LA misma. Petición de certiorari, pág. 10.
Una vez evaluado el recurso, decidimos expedir el auto de certiorari solicitado. Teniendo el beneficio de la compa-recencia de ambas partes, procedemos a resolver.
II
A. Ley de Municipios Autónomos
A inicios de la década de los noventa, y muy en particular para 1991, la Asamblea Legislativa aprobó varias pie-zas de legislación dirigidas a reformar integralmente la constitución, la organización, la administración y el funcio-namiento de los gobiernos municipales de Puerto Rico. “ 'Esta reforma abarcadora del ordenamiento municipal otorgó a los municipios un mayor grado de autonomía fiscal y de gobierno propio, además de nuevos instrumentos administrativos y fiscales’ ”. Mun. San Juan v. Banco Gub. Fomento, 140 D.P.R. 873, 885 (1996), citando a Alcalde Mun. de Humacao v. Ramos Cofresí, 140 D.P.R. 587, 595 *811 (1996). Esta reforma estuvo dirigida a fomentar la autono-mía gestora del gobierno municipal permitiendo, de ese modo, una atención más directa y eficaz a los asuntos, los problemas y las necesidades de sus habitantes. Unlimited v. Mun. de Guaynabo, 183 D.P.R. 947 (2011).
Entre la legislación más significativa se aprobó la Ley de Municipios Autónomos, mediante la cual se aspiraba a abandonar el esquema centralizado de gobierno que impe-raba proveyendo, de ese modo, una mayor autonomía ad-ministrativa y fiscal a los municipios encaminada a poten-ciar su desarrollo a nivel local.
Uno de los propósitos perseguidos por la Ley de Municipios Autónomos era establecer una nueva política pública gubernamental dirigida a “otorgar a los municipios el máximo posible de autonomía y proveerles las herramientas financieras, así como los poderes y facultades necesarias para asumir una función central y fundamental en su desarrollo urbano, social y económico”. (Enfasis nuestro). Art. 1.002 de la Ley de Municipios Autónomos, 21 L.P.R.A. see. 4001 n. Véanse, además: E.L.A. v. Crespo Torres, 180 D.P.R. 776, 787 (2011); Mun. San Juan v. Banco Gub. Fomento, supra, pág. 886.
Como parte de la reforma municipal se facultó a los mu-nicipios a “ordenar, reglamentar y resolver cuando sea ne-cesario o conveniente para atender las necesidades locales y para su mayor prosperidad y desarrollo”. Art. 2.004 de la Ley de Municipios Autónomos, 21 L.P.R.A. see. 4054. Entre estas facultades se le autorizó a establecer la política, las estrategias y los planes dirigidos a ordenar su territorio y a la conservación de sus recursos, todo ello con el fin de al-canzar un desarrollo óptimo de sus suelos. Art. 2.004(h) de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4054(h).
En la delegación de poderes y facultades del Gobierno Central a los municipios se autorizó, mediante la Ley de Municipios Autónomos, la transferencia de algunas de las facultades de la Junta de Planificación y de A.R.Pe. *812 a los entes municipales para que sean éstos mismos los que atiendan los asuntos de ordenación territorial, incluyendo querellas, autorizaciones y permisos dentro de sus límites territoriales. En su Artículo 13.012 (21 L.P.R.A. see. 4610), la Ley de Municipios Autónomos desglosa, desde una Je-rarquía I a una Jerarquía V, las distintas facultades de ordenación territorial que pueden ser transferidas a los municipios.([10]) Estas serán transferidas por medio de un convenio que, además de especificar las facultades trans-mitidas al municipio, establecerá las limitaciones en los poderes delegados.
Antes de que la Junta de Planificación y A.R.Pe. puedan efectuar la transferencia de las facultades, el municipio tendrá que crear una Oficina de Permisos. Art. 13.012 de la Ley de Municipios Autónomos, supra. Las funciones de dicha oficina serán, entre otras:
(a) Tramitar solicitudes de autorizaciones y permisos de conformidad a las facultades transferidas al municipio me-diante convenio.
(b) ....
(c) Celebrar vistas públicas relacionadas con la otorgación de autorizaciones o permisos y efectuar todas las actividades incidentales a las mismas.
(d) .... Art. 13.013 de la Ley de Municipios Autónomos, 21 L.P.R.A. see. 4611.
Las facultades transferidas deben ser ejercidas “confor-me a las normas y procedimientos establecidos en la legislación, reglamentación y política pública aplicable a la fa-cultad transferida, incluyendo [los artículos de la Ley *813 Núm. 170 de 12 de agosto de 1988, mejor conocida] como ‘Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico’ [3 L.P.R.A. see. 2101 et seq.]”. Art. 13.012 de la Ley de Municipios Autónomos, supra.
La Oficina de Permisos será dirigida por un Oficial de Permisos, el cual, previo a tomar una decisión discrecional sobre alguna de las facultades que le hayan sido transferi-das, requerirá la formación de un Comité de Permisos. ‘‘El Comité de Permisos evaluará las distintas autorizaciones o permisos que requieran variaciones de construcción o de instalación de rótulos y anuncios, excepciones, o determi-naciones sobre usos o estructuras no conformes legales, y emitirán su recomendación escrita al Oficial de Permisos, quien decidirá la aprobación o denegación de tal acción”. Art. 13.013 de la Ley de Municipios Autónomos, supra.
En asuntos de ordenación de los suelos municipales, además de la transferencia de facultades de la Junta de Planificación y de A.R.Pe., la Asamblea Legislativa también autorizó a los municipios a adoptar un Plan de Ordenación Territorial que oriente la ordenación integral y estratégica del territorio municipal y que enuncie la política pública sobre el desarrollo y uso de sus suelos. Arts. 13.004 y 13.005 de la Ley de Municipios Autónomos, 21 L.P.R.A. sees. 4602 y 4603; Unlimited v. Mun. de Guaynabo, supra. Su propósito será, entre otros, ordenar el suelo urbano persiguiendo un:
(1) desarrollo balanceado de usos a través de la ciudad, in-corporando usos diversos pero compatibles en la misma para lograr comunidades mixtas donde se posibilite el acceso pea-tonal a los diferentes usos;
(2) fortalecimiento de la estructura económica, social y fí-sica de cada barrio o vecindario, de acuerdo a sus caracterís-ticas particulares, equipando los distintos barrios o vecinda-rios de los servicios y variedad de usos necesarios o deseables; .... (Énfasis nuestro). Art. 13.002(f) de la Ley de Municipios Autónomos, 21 L.P.R.A. see. 4601 n.
*814 Los Planes de Ordenación “protegerán los suelos, promoverán el uso balanceado, provechoso y eficaz de los mismos y propiciarán el desarrollo cabal de cada municipio”. Art. 13.004 de la Ley de Municipios Autónomos, supra. Su desarrollo requerirá “el estudio y la recopilación de un complejo entramado de documentos, cuyo contenido revela[rá] un minucioso análisis de la realidad socio-espacial del municipio”. (Enfasis nuestro). Unlimited v. Mun. de Guaynabo, supra, pág. 963. Una vez los Planes de Ordenación entren en vigor, toda decisión sobre el uso de los suelos se hará en conformidad con éstos.
El 16 de febrero de 1995 el Municipio suscribió un Con-venio de Transferencias (Convenio),([11]) junto con la Junta de Planificación y A.R.Pe., mediante el cual le fueron transferidas las facultades para otorgar ciertos permisos y autorizar consultas de ubicación de proyectos. Mediante dicho Convenio —revisado y adoptadas sus revisiones el 31 de octubre de 2000 y el 14 de mayo de 2003— el Municipio obtuvo la transferencia de competencias sobre ordenación territorial, entre las que se encuentran la autorización de anteproyectos, según lo dispuesto en el Artículo 13.012 de la Ley de Municipios Autónomos, supra.
Desde el primer Convenio se consignó que éste tenía el propósito de poner en vigor la política pública que el Go-bierno de Puerto Rico estableció mediante la Ley de Muni-cipios Autónomos, de otorgar a los municipios la mayor au-tonomía posible, así como las facultades y los poderes necesarios para asumir su responsabilidad de fomentar su desarrollo urbano, social y económico. En el mismo se dis-puso que:
Será responsabilidad fundamental de la Oficina el promover que toda estructura, pública o privada, espacio público y/o pri-vado u obra de construcción reúnan los parámetros de ordena- *815 ción territorial vigentes, en conformidad con las disposiciones conferidas por la Ley de Municipios Autónomos, según enmendada. Anejo F del Convenio de Transferencia, pág. 4.
Asimismo, en el Convenio se expresó que el Municipio había adoptado desde el 18 de diciembre de 1992 un Plan Territorial([12]) con el fin de propiciar un uso juicioso y un aprovechamiento óptimo de su territorio, asegurando así el bienestar de las generaciones actuales y futuras, a la vez que promover un proceso de desarrollo ordenado, racional e integral.
B. Reglamentación aplicable a las áreas reservadas para servicios vecinales
Entre las autorizaciones que concederán las oficinas municipales de permisos se encuentran aquellas relativas a las propuestas de desarrollos en las áreas vecinales de las urbanizaciones. Es preciso conocer que fue mediante legislación que se estableció el requisito de reservar ciertos predios de las urbanizaciones para usos accesorios. Veamos.
La Ley 25 instituyó el requisito de designar parte de las áreas destinadas para desarrollos urbanos como facilida-des vecinales. Desde su aprobación, la ley vislumbró que la extensión o magnitud de tales áreas dependería del nú-mero de solares residenciales o unidades de vivienda en cada desarrollo, de modo tal que dichas facilidades se ajus-taran a las necesidades de cada comunidad. Art. 7 de la Ley 25 (23 L.P.R.A. sec. 30g).
*816 En virtud del mandato contenido en el Artículo 7 de la Ley 25, el 17 de mayo de 1963 se aprobó el Reglamento sobre Facilidades Vecinales, Reglamento Núm. 876 del De-partamento de Estado de 17 de mayo de 1963. En este reglamento se establecía, entre otras disposiciones, que los urbanizadores tenían que preparar un anteproyecto con la distribución y uso de todos los locales que se proyectaran utilizar para fines comerciales en los predios de las áreas vecinales. Establecía, además, el tipo de comercios que se podía construir, sus dimensiones y su rotulación. Sobre el particular, y en lo pertinente al caso ante nos, el regla-mento arriba indicado disponía que el área de los edificios no excedería de un treinta por ciento del área del solar.
El Reglamento sobre Facilidades Vecinales fue derogado por el Reglamento de Lotificación y Urbanización de la Junta de Planificación (Reglamento de Lotificación y Urbanización).([13]) Este, a su vez, fue enmendado transcu-rrido sólo unos meses desde su aprobación.([14]) Posterior-mente, el 3 de enero de 2001 el Secretario de Estado pro-mulgó un nuevo Reglamento de Lotificación y Urbanización (Reglamento de Planificación Núm. 3).([15]) En lo pertinente al caso ante nos, la Sección 10.04(4) de este último reglamento, disponía:
4. Instalaciones Comerciales - ... La Administración del mu-nicipio autónomo, tomando en consideración la magnitud, tipo, naturaleza o localización de dicho proyecto, las vías de tránsito existentes y propuestas, la existencia de otros negocios legalmente establecidos en los alrededores, determinará el tipo y tamaño de solar comercial a desarrollarse, conforme al Dis-trito C-6 según definido en el Reglamento de Zonificación de Puerto Rico (Reglamento de Planificación Núm. 4). ... (Enfasis *817 nuestro). Reglamento Núm. 6283, Departamento de Estado, 3 de enero de 2001, See. 10.04(4), págs. 53-54.
El 24 de junio de 2005 el Departamento de Estado pro-mulgó una nueva versión enmendada del Reglamento de Lotificación y Urbanización, la cual adoptaron la Junta de Planificación y A.R.Pe.([16]) A esta nueva versión del Regla-mento de Lotificación y Urbanización se le añadió una Sec-ción 1.12, que dispone:
Aquellos casos de urbanizaciones residenciales que como parte de las facilidades vecinales se hayan requerido facilidades co-merciales pero que no se hayan zonificado conforme a los pa-rámetros de uso comercial autorizado, se evaluarán tomando en consideración los criterios comerciales para los cuales se requirieron las facilidades. Reglamento Núm. 6992, Departa-mento de Estado, 24 de junio de 2005, pág. 1-6.
Asimismo, dicho reglamento contiene la disposición re-ferente a las instalaciones comerciales en áreas destinadas para facilidades vecinales —al igual que el reglamento anterior— la cual establece:
4. Instalaciones Comerciales - ... La ARPE o el Municipio Au-tónomo, tomando en consideración la magnitud, tipo, natura-leza o localización de dicho proyecto, las vías de tránsito exis-tentes y propuestas, la existencia de otros negocios legalmente establecidos en los alrededores, determinará el tipo y tamaño de solar comercial a desarrollarse conforme al Distrito C-6, según definido en el Reglamento de Zonificación de Puerto Rico (Reglamento de Planificación Núm. 4) o conforme a los Mapas de Calificación en el Plan Territorial. (Enfasis nuestro). Reglamento Núm. 6992, supra, Sec. 10.04(4), págs. 10-10 a 10-11.
El Reglamento de Zonificación, promulgado por el De-partamento de Estado el 5 de octubre de 2000, “tiene el propósito de guiar y controlar el uso y desarrollo de los terrenos en Puerto Rico con el fin de contribuir a la segu-ridad, el orden, la convivencia, la solidez económica y el *818 bienestar general de los actuales y futuros habitantes”. Sec. 1.03 del Reglamento de Zonificación de Puerto Rico (Reglamento de Planificación Núm. 4), Reglamento Núm. 6211, Departamento de Estado, 5 de octubre de 2000, pág. 1.
Es precisamente la Sección 1.04 de dicho reglamento la que faculta a los Municipios Autónomos a implantar las disposiciones de este reglamento cuando a los entes muni-cipales se les hayan delegado, mediante convenio legal, fa-cultades de la Junta de Planificación y de A.R.Pe.
El Reglamento de Zonificación reúne, en su Sección 26.00, todas las especificaciones relativas a los Distritos C-6. Este distrito en particular fue diseñado precisamente para detallar los criterios que han de guiar los desarrollos de facilidades comerciales en predios de servicios vecinales. Entre los aspectos considerados, la Sección 26.02 enumera los usos permitidos, entre los que se con-templan los comercios al detal de artículos de consumo o uso corriente en el hogar. Las Secciones 26.03 y 26.04 de-tallan lo concerniente a la altura de las edificaciones y a la densidad poblacional, respectivamente.
Las Secciones 26.05 y 26.06 disponen, a su vez, los asuntos atinentes al área de ocupación y al área bruta de piso, respectivamente. Estas secciones, específicamente, establecen:
26.05 [Á]rea de Ocupación en Distritos C-6 — El área de ocu-pación no excederá del treinta por ciento (30%) del área del solar.
26.06 [Á]rea Bruta de Piso en Distritos C-6 — El área bruta de piso no excederá del sesenta por ciento (60%) del área del solar. En ningún caso el área bruta de piso de cualquier planta sobre la primera excederá el por ciento máximo de área de ocupación permitido en el distrito. Reglamento Núm. 6211, supra, pág. 129.
*819 C. Revisión de las determinaciones de las Oficinas Munici-pales de Permisos
Una vez un municipio toma una decisión en cuanto a las solicitudes de permisos, conforme a lo establecido en la le-gislación y reglamentación aplicables, su determinación debe estar sujeta a revisión.
La normativa sobre la revisión de las decisiones emitidas por las oficinas de permisos de los municipios se encuentra en el Artículo 13.016 de la Ley de Municipios Autónomos, 21 L.P.R.A. see. 4614, que establece, en lo pertinente al recurso ante nos:
Los términos, trámites, y condiciones para las solicitudes de reconsideración, de apelación o de revisión judicial de las de-cisiones del municipio, serán:
(a) Los aplicables a decisiones de la Administración de Re-glamentos y Permisos si la competencia de que se trate le fue transferida de dicha agencia al municipio.
(b) Los aplicables a decisiones de la Junta de Planificación si la competencia le fue transferida de dicha agencia al municipio.
Como parte del proceso de revisión de las determinacio-nes de A.R.Pe., la Asamblea Legislativa estableció en su ley orgánica, Ley Núm. 76 de 24 de junio de 1975 (23 L.P.R.A. sec. 71 et seq.), un procedimiento de apelación in-teragencial ante la JACL previo al trámite de revisión judicial. La JACL era un organismo administrativo de ca-rácter cuasijudicial, cuya facultad revisora se activaba cuando una parte directamente interesada o afectada pre-sentaba la correspondiente apelación de una actuación, de-terminación o resolución de A.R.Pe. o de algún municipio autónomo con facultades transferidas de dicha agenciad([17]) 23 L.P.R.A. sec. 72c; 21 L.P.R.A. see. 4614; Maymí v. Gob. Mun. Aut. Ponce, 151 D.P.R. 689 (2000).
*820 Se contemplaba una vista como parte de los procedimien-tos ante la JACL, en la cual se podía presentar toda la prueba necesaria para adjudicar el caso. 23 L.P.R.A. see. 72c(c). “[L]a J.A.C.L. podfía] decretar órdenes, requerimien-tos, resoluciones o las determinaciones que a su juicio deb[í]an dictarse y, a tal fin, ‘ten[ía] los mismos poderes del funcionario u organismo de cuya actuación se apela[ba] ...’ ”. (Énfasis suprimido). Vélez v. A.R.Pe., 167 D.P.R. 684, 696 (2006). Véase 23 L.P.R.A. sec. 72c(c)(3).
Estas disposiciones permitían a la JACL considerar el caso en todos sus méritos, igual que lo hacía la agencia que actuaba en primera instancia, y realizar sus propias deter-minaciones de hechos y conclusiones de derecho. Vélez v. A.R.Pe., supra; Junta de Planificación v. J.A.C.L., 109 D.P.R. 210 (1979). Es decir, la “J.A.C.L. no est[aba] limi-tada a revisar únicamente la prueba que consideró el fun-cionario con jurisdicción original en el asunto”. Vélez v. A.R.Pe., supra, pág. 697.
Anteriormente hemos establecido que disposiciones de ley similares que permiten a los organismos apelativos ce-lebrar vistas, recibir prueba adicional a la evaluada inicial-mente por la agencia y llegar a sus propias conclusiones a base de la prueba desfilada, poseen facultades revisoras de la naturaleza de un juicio “de novo”.([18]) Vélez v. A.R.Pe., supra.
Como hemos apreciado, en el caso ante nos, por disposi-ción explícita de la ley orgánica de A.R.Pe., “[l]as decisio-nes adoptadas por la Administración de Reglamentos y Permisos (ARPE) [y en nuestro caso en particular por las *821 Oficinas de Permisos Municipales con poderes delegados por la A.R.Pe.] p [odian] ser revisadas mediante un juicio de novo ante la Junta de Apelaciones sobre Construcciones y Lotificaciones (JACL)”. (Enfasis en el original y cita omitida). J. Echevarría Vargas, Derecho administrativo puertorriqueño, San Juan, Puerto Rico, Ediciones SITUM, Inc., 2012, pág. 288 “[E]l juicio de novo ... garantiza la celebración de unos procedimientos nuevos que no descan-san en los que pudieran haberse celebrado ante la agencia administrativa. El tribunal revisor no está atado en ma-nera alguna por las determinaciones y conclusiones de la agencia”. D. Fernández Quiñones, Derecho administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed., Colombia, Ed. Forum, 2001, pág. 578.
D. Revisión judicial de las determinaciones administrati-vas
“Una vez agotado el proceso administrativo, que incluye la apelación interagencial, la decisión final deberá revi-sarse judicialmente dentro de los parámetros del principio de deferencia judicial ...”. (Énfasis suprimido). Vélez v. A.R.Pe., supra, pág. 698.
En un sinnúmero de ocasiones nos hemos expresado sobre la norma jurídica que establece que los dictámenes de los organismos administrativos merecen la mayor deferencia judicial. Torres Santiago v. Depto. Justicia, 181 D.P.R. 969 (2011); Asoc. Fcias. v. Caribe Specialty et al. II, 179 D.P.R. 923 (2010); Otero v. Toyota, 163 D.P.R. 716 (2005). Dicha normativa está asentada en el principio de que son los organismos administrativos los que cuentan con el conocimiento especializado sobre los asuntos que por ley se les han delegado. Id.; Asoc. Fcias. v. Caribe Specialty et al. II, supra; JP, Plaza Santa Isabel v. Cordero Badillo, 111 D.P.R. 177 (2009).
En cuanto a las determinaciones de hechos formuladas por la agencia, hemos establecido que, como norma *822 general, los tribunales no intervendremos con éstas, siem-pre y cuando surja del expediente administrativo evidencia sustancial que las sustente. Para tomar dicha determina-ción, los tribunales utilizaremos un criterio de razonabili-dad y deferencia. Asoc. Fcias. v. Caribe Specialty et al. II, supra.
Por otro lado, los tribunales podrán revisar las conclu-siones de derecho de las agencias administrativas en todos sus aspectos. Torres Santiago v. Depto. Justicia, supra; Asoc. Fcias. v. Caribe Specialty et al. II, supra. Esto no quiere decir, sin embargo, que los tribunales podamos des-cartar libremente las conclusiones e interpretaciones de la agencia. Torres Santiago v. Depto. Justicia, supra; Asoc. Fcias. v. Caribe Specialty et al. 11, supra; Otero v. Toyota, supra. La deferencia reconocida a las decisiones de las agencias administrativas habrá de ceder, solamente, cuando no esté basada en evidencia sustancial, cuando la agencia haya errado en la aplicación de la ley y cuando su actuación resulte arbitraria, irrazonable o ilegal. Torres Santiago v. Depto. Justicia, supra; Asoc. Fcias. v. Caribe Specialty et al. II, supra; Otero v. Toyota, supra.
Recientemente en IFCO Recycling v. Aut. Desp. Sólidos, 184 D.P.R. 712, 744-745 (2012), citando & Empresas Ferrer v. A.R.Pe., 172 D.P.R. 254, 264 (2007), expusimos que la deferencia concedida a las agencias administrativas solo cederá cuando:
“... (1) la determinación administrativa no está basada en evi-dencia sustancial; (2) el organismo administrativo ha errado en la aplicación o interpretación de las leyes o los reglamentos que se le ha encomendado administrar; (3) cuando el orga-nismo administrativo actúa arbitraria, irrazonable o ilegal-mente, realizando determinaciones carentes de una base ra-cional, o (4) cuando la actuación administrativa lesiona derechos constitucionales fundamentales ...”.
*823 HH HH HH
Establecida la normativa legal que gobierna el presente recurso, pasaremos a aplicarla a los hechos del presente caso.
En virtud de las disposiciones del Artículo 13.012 de la Ley de Municipios Autónomos, supra, el 16 de febrero de 1995 el Gobierno Central le transfirió al Municipio ciertas competencias de la Junta de Planificación y de A.R.Pe. me-diante un Convenio. En aras de poner en vigor las faculta-des delegadas, el Municipio creó la OMPU, oficina que se encargaría de tramitar todas las autorizaciones y los per-misos, conforme a las facultades que le fueran conferidas en el referido Convenio.
Tal y como mencionáramos, en la presente situación de hechos, Sembler sometió una Consulta sobre Conformidad ante la OMPU el 10 de abril de 2001, atinente a la cons-trucción de una tienda Walgreens para la venta de artícu-los al detal en un área destinada para facilidades vecinales ubicada en un Distrito R-3. Cumpliendo con los procedi-mientos establecidos en la Ley de Municipios Autónomos, la OMPU sometió la Consulta sobre Conformidad para que el Comité de Permisos lo considerara, el cual luego de eva-luar la solicitud, recomendó denegarla. Una vez recibida la recomendación del Comité de Permisos y de considerar los hechos presentados ante sí, el Director de la OMPU la ra-tificó, denegando, de este modo, la solicitud. Luego de otros trámites procesales, que incluyeron la revocación de la de-terminación de la OMPU por la JACL y la confirmación de dicha decisión por el tribunal apelativo intermedio, la con-troversia ha llegado a nuestra atención.
Hoy nos toca dilucidar si, en efecto, la OMPU contaba con discreción para tomar en cuenta criterios contenidos en su Plan de Ordenación Territorial y en los Reglamentos de la Junta de Planificación aplicables al caso, o si debía apro- *824 bar la Consulta sobre Conformidad solicitada por Sembler de forma ministerial, como éstos últimos alegan.
Como mencionáramos, la Ley de Municipios Autónomos autoriza a los municipios a adoptar Planes de Ordenación Territorial con el propósito de proteger los suelos, promo-ver su uso balanceado, provechoso y eficaz, y propiciar el desarrollo cabal del municipio. Dicha legislación dispone la existencia de tres tipos de Planes de Ordenación Territorial que atenderán diferentes aspectos de la ordenación del es-pacio municipal: Plan Territorial, Plan de Ensanche y Plan de Área. Art. 13.004 de la Ley de Municipios Autónomos, supra. En lo que respecta al caso ante nos, la Ley de Mu-nicipios Autónomos define, en su Artículo 13.003(s), 21 L.P.R.A. see. 4601, que el Plan Territorial es “el Plan de Ordenación que abarca un municipio en toda su extensión territorial, que enuncia y dispone la política pública sobre su desarrollo y sobre el uso del suelo”. Añade que, una vez entre en vigor el Plan Territorial, “toda decisión sobre el uso del suelo se hará en conformidad con el mismo”. (Enfasis nuestro). Art. 13.005 de la Ley de Municipios Autónomos, 21 L.P.R.A. see. 4603. Véase, además, Borschow Hosp. v. Jta. de Planificación, 177 D.P.R. 545, 561 (2009).
Por otro lado, el Reglamento de Lotificación y Urbaniza-ción autoriza a los municipios a tomar en cuenta factores tales como la magnitud, el tipo, la naturaleza, la localiza-ción, las vías de tránsito existentes y las propuestas y la existencia de otros negocios legalmente establecidos al otorgar o denegar los permisos para el establecimiento de comercios en áreas vecinales del territorio municipal.
Teniendo en cuenta las disposiciones estatutarias y re-glamentarias antes citadas, entendemos meritorias las ale-gaciones presentadas por el Municipio y la OMPU en este caso. En específico, resolvemos que la evaluación de la so-licitud presentada por Sembler conllevaba un ejercicio de discreción de la OMPU, que requería la ponderación de la política pública establecida por el Municipio para el uso *825 eficiente de sus suelos y de los factores reglamentarios antes desglosados, de modo que se garantizara que el pro-yecto propuesto estuviese conforme con la función para la cual se había destinado el predio en cuestión. Todo lo anterior enmarcado en el Desarrollo Preliminar que había aprobado la Junta de Planificación para habilitar esa área de la Urbanización Villa Carolina.
Cuando la JACL tuvo el caso ante su consideración, se circunscribió a dictaminar que la OMPU había errado al evaluar el proyecto dentro de los parámetros de un Distrito R-3([19]) —cuando correspondía hacerlo bajo los criterios de un Distrito C-6— habida cuenta de que son éstos los crite-rios aplicables a predios destinados para usos accesorios.![20]) No obstante, no entró a considerar la legisla-ción que exige que se destinen algunas áreas de los proyec-tos residenciales para facilidades vecinales, ni toda la re-glamentación desarrollada por la Junta de Planificación compatible; tampoco entró a sopesar toda la política pú-blica, tanto estatal como municipal, erigida en torno al uso racional y ordenado de los terrenos, ni realizó determina-ciones conducentes a demostrar de qué modo el proyecto cumplía con los criterios del Distrito C-6.([21])
Del mismo modo, el Tribunal de Apelaciones confirmó el dictamen de la JACL basándose primordialmente en la doctrina que aboga por la deferencia a las determinaciones de las agencias administrativas. Sin embargo, entendemos que la decisión de la JACL, a la cual el foro apelativo in- *826 termedio le ha brindado la mayor deferencia, no fue una razonable, pues no refleja un análisis abarcador y exhaus-tivo de toda la reglamentación y política pública que fa-culta a las agencias del Gobierno Central, así como a los Municipios Autónomos, a evaluar de forma integral y dete-nida cada solicitud atinente al desarrollo de sus suelos.
Básicamente, el análisis del tribunal apelativo interme-dio y de la JACL se limitó a una aplicación mecánica de las guías contenidas en la Sección 1.12 del Reglamento de Lo-tificación y Urbanización, Reglamento Núm. 6992, supra. No reflejó análisis alguno sobre el efecto que tendría la concesión del permiso en la seguridad, la salud y el interés de la comunidad, factores medulares que, según la legisla-ción y la reglamentación, han de tomarse en cuenta al con-ceder o denegar permisos como éste.
En el caso de autos, se trata de un solar que fue sepa-rado para usos accesorios conforme lo dispuesto por la Ley 25 y para cumplir con unos propósitos en particular. El Municipio, tomando en consideración las dimensiones y la naturaleza del proyecto, los desarrollos en las áreas adya-centes, las vías de tránsito existentes y el impacto del pro-yecto sobre éstas, determinó que este proyecto rebasaba los parámetros estatutarios y reglamentarios aplicables al predio en cuestión. Al así hacerlo, ejerció su función de adjudicación discrecional y descargó su responsabilidad de acuerdo con las facultades conferidas por los convenios de transferencia.
En particular, el Municipio determinó que el uso solici-tado era contrario a la política pública establecida en el Plan de Usos de Terreno de la Región Metropolitana de San Juan, de la cual Carolina es parte. Específicamente, precisó que el proyecto propuesto no estaba acorde con la meta de promover la diversificación de actividades y de usos compatibles y complementarios, y que, por el contra-rio, el mismo creaba un impacto adverso en los usos existentes. Asimismo, el Municipio expresó que su denega- *827 toria tenía como propósito evitar que continuara el creci-miento indiscriminado de comercios en las calles principa-les que dan acceso a los vecindarios residenciales y que afectan la calidad de vida de los residentes.
Algunos de los factores tomados en consideración por el Municipio al emitir su determinación fueron que: (1) el ta-maño y la magnitud de la tienda propuesta son mayores al de los comercios de venta al detal que se encuentran en el área; (2) la localización del proyecto estaría a menos de cincuenta metros de una intersección con gran volumen de tránsito, por lo que la entrada y salida de vehículos al es-tablecimiento ocasionaría un mayor problema de flujo vehicular en las vías existentes; (3) a una corta distancia se encuentra una Farmacia Walgreens con venta de artículos al detal; (4) en los alrededores de la tienda propuesta se encuentran otros comercios con venta de artículos al detal, por lo que el área se encuentra bien servida en cuanto a ese tipo de establecimiento; (5) el proyecto no estaría acorde con el concepto de facilidad vecinal, según fue concebido originalmente; (6) el desarrollo implica una agrupación de solares para la ubicación de una tienda de gran tamaño, que no está dirigida a llenar las necesidades del vecinda-rio, pues éstos están servidos, en demasía, con múltiples establecimientos que ofrecen artículos similares a los que se propone vender.
La posición del Municipio es que, tanto en consideración a la Ley 25 y a la reglamentación sobre facilidades vecina-les, como a las distintas políticas públicas de ordenación territorial, la evaluación de la referida Consulta conllevaba un cuidadoso ejercicio de discreción y la ponderación de varios factores que ayudaran a determinar la conformidad del proyecto.([22]) En ese sentido, su determinación consti- *828 tuyo, sin lugar a dudas, un ejercicio de discreción necesa-rio, legítimo y razonable.
Los recurridos no pueden, además, justificar la autori-zación de su Consulta sobre Conformidad utilizando el ar-gumento de que en esa área de “usos accesorios” se ha per-mitido la instalación de otros establecimientos comer-ciales. El permiso concedido a otros no les brinda un dere-cho a ellos ni, mucho menos, despoja a la OMPU de su facultad de realizar las evaluaciones y el análisis pertinentes para determinar si procede aprobar la Consulta sobre Conformidad en cuestión. De hecho, es importante hacer notar que el tamaño de los otros negocios, a los que Sembler hace referencia, no compara con el propuesto/[23])
En conclusión, en virtud de las disposiciones estatuta-rias y reglamentarias aplicables al caso ante nos, recono-cemos la facultad de la OMPU para ejercer su discreción y tomar en cuenta, tanto la política pública promulgada por el Municipio para el desarrollo de sus terrenos, como todos y cada uno de los factores establecidos en las leyes y los reglamentos relativos a la ordenación territorial, al evaluar las solicitudes de permisos presentadas ante su consideración. Todo lo anterior con el fin último de lograr un desarrollo coordinado, racional y balanceado dentro de los límites territoriales de su municipio y de forma que se logre alcanzar con ello el bienestar general de sus habitantes. “La misión de un municipio autónomo, que ad-viene a las facultades y competencias de organizar el uso de sus suelos, es planificar de forma coordinada y cohe-rente la maximización de éstos, conforme a las necesidades que impone su propia realidad social, económica y *829 espacial”. (Énfasis nuestro). Unlimited v. Mun. de Guaynabo, supra, pág. 979. Además, la propia Ley de Munici-pios Autónomos dispone en su Artículo 1.004 (21 L.P.R.A. see. 4002), que
[i] os poderes y facultades conferidos a los municipios por este subtítulo o cualquier otra ley, excepto disposición en contrario, se interpretarán liberalmente, en armonía con la buena prác-tica de política pública fiscal y administrativa, de forma tal que siempre se propicie el desarrollo e implantación de la po-lítica pública enunciada en este subtítulo de garantizar a los municipios las facultades necesarias en el orden jurídico, fiscal y administrativo para atender eficazmente las necesidades y el bienestar de sus habitantes. (Enfasis nuestro). Véase, además, E.L.A. v. Crespo Torres, supra, págs. 787-788.
Es a tenor con la norma de hermenéutica de interpreta-ción liberal esbozada anteriormente que interpretamos las disposiciones aplicables a la controversia de autos, recono-ciéndole discreción a la OMPU para tomar en cuenta todos los factores de ordenación territorial pertinentes cuando emita una decisión que tendrá un impacto sobre el uso de los terrenos en su Municipio. Todo ello en aras de lograr un desarrollo seguro y saludable que propicie el mayor bien-estar de sus habitantes.
Por consiguiente, erró el Tribunal de Apelaciones al con-firmar la Resolución recurrida, mediante la cual la JACL revocó la denegatoria de la OMPU y autorizó una Consulta sobre Conformidad que no está acorde con la normativa estatutaria y reglamentaria, y con las políticas públicas sobre ordenamiento territorial desarrolladas por el Muni-cipio y aplicables al predio en cuestión.
H-i <!
Por los fundamentos anteriormente esbozados, revoca-mos la Sentencia dictada por el Tribunal de Apelaciones.

Se dictará Sentencia de conformidad.

*830 El Juez Presidente Señor Hernández Denton y el Juez Asociado Señor Martínez Torres se inhibieron. La Juez Asociada Señora Rodríguez Rodríguez no intervino.

(1) Ley Núm. 81-1991 (21 L.P.R.A. see. 4001 et seq.).

(2) Reglamento Núm. 6211 (Reglamento de Planificación Núm. 4), Departa-mento de Estado, 5 de octubre de 2000 (Reglamento de Zonificación). El Reglamento de Calificación de Puerto Rico (Reglamento de Planificación Núm. 4), Reglamento Núm. 7511 del Departamento de Estado de 29 de mayo de 2008, anuló el Reglamento de Zonificación Núm. 6211. Unos meses más tarde, es decir, el 11 de diciembre de *804 2008, el Reglamento Núm. 7628, Reglamento de Calificación de Puerto Rico (Reglamento de Planificación Núm. 4), anuló el Reglamento Núm. 7511.

(3) Hoy conocida como la Oficina de Gerencia de Permisos, en virtud de lo dis-puesto en la Ley Núm. 161-2009, según enmendada, 23 L.P.R.A. see. 9011 et seq. (Ley 161).

(4) En los escritos que obran en el expediente del recurso ante nos, así como en las determinaciones emitidas por la Junta de Apelaciones de Construcciones y Loti-ficaciones (JACL) y por el Tribunal de Apelaciones, se utilizan indistintamente los términos “Consulta” o “Anteproyecto” para referirse a la solicitud presentada ante la Oficina Municipal de Permisos Urbanísticos (OMPU) por Sembler. El Reglamento de Zonificación, en su pág. 5, define anteproyecto como “[florma preliminar de un plano de construcción de obras, así como de estructuras, preparado por un profesional autorizado en Ley para continuar con las próximas etapas, que se somete a la ARPE o a un Municipio Autónomo, para determinar si cumple con las leyes y reglamentos aplicables”. (Enfasis nuestro).

(5) Debe mencionarse que ya previamente el 5 de enero de 2001 The Sembler Company of Puerto Rico (Sembler) había presentado una solicitud similar para la ubicación de una Farmacia Walgreens en la misma propiedad. Dicha solicitud fue denegada mediante una Resolución emitida el 15 de marzo de 2001 por fundamentos de ordenación territorial y por no haberse presentado un Certificado de Necesidad y Conveniencia (CNC) otorgado por el Departamento de Salud que los autorizara a operar la farmacia. Curiosamente, aunque los recurridos desistieron ante la OMPU *806 del proceso para establecer una farmacia y optaron por solicitar un permiso para la eventual construcción de una tienda de ventas al detal de la misma cadena, el 16 de octubre de 2001, es decir, paralelo a los trámites del caso de autos ante la JACL, Walgreens of PR, Inc. inició un procedimiento ante el Departamento de Salud para obtener el mencionado CNC y poder operar una farmacia en la referida localidad. El 10 de agosto de 2004 el Secretario de Salud concedió, finalmente, el referido CNC.

(6) Recientemente, la Asamblea Legislativa aprobó la Ley para la Reforma del Proceso de Permisos de Puerto Rico (Ley 161) con el propósito de mejorar la calidad y la eficiencia en la evaluación de las solicitudes de permisos de construcción en Puerto Rico. 23 L.P.R.A. 9011 n. Aun cuando dicho estatuto reformó y derogó todas las disposiciones de la Ley Núm. 76 de 24 de junio de 1975, creó un organismo equivalente a la JACL, denominado Junta Revisora de Permisos y Usos de Terrenos (Junta Revisora). En los procesos ante la Junta Revisora, tal como ocurría en los *807 procedimientos ante la JACL, se vislumbra el derecho de las partes a someter prueba adicional que le permita a dicho organismo apelativo administrativo adjudicar el caso, a la vez que le faculta a revisar las determinaciones de hechos y conclusiones de derecho en todos sus aspectos. 23 L.P.R.A. secs. 9022c y 9022d.

(7) Reglamento Núm. 876, Departamento de Estado, 17 de mayo de 1963.

(8) Supuestamente de forma ministerial.

(9) En uno de los memorandos de derecho presentado ante la JACL, Sembler aclara que el único permiso concedido por la OMPU fue el del restaurante Wendy’s, ya que los permisos otorgados para establecer el restaurante Sizzler se hicieron a través de la Administración de Reglamentos y Permisos (A.R.Pe.).

(10) Sobre el particular, el Secretario de Justicia expresó: “Previo a la aprobación de la Ley de Municipios Autónomos, el proceso de planificación y ordenación de los usos del terreno recaía casi exclusivamente en la Junta de Planificación. Esta fun-ción queda ahora compartida por los municipios, a los cuales se les han conferido las facultades y responsabilidades para llevarlo a cabo, en coordinación con las agencias del Gobierno central”. Op. Sec. Just Núm. 17-1992. No obstante, es preciso recordar que en nuestro ordenamiento jurídico las opiniones del Secretario de Justicia tienen carácter persuasivo, mas no obligan a los tribunales. E.L.A. v. Crespo Torres, 180 D.P.R. 776 (2011).

(11) Convenio de Transferencia de Facultades de la Junta de Planificación y la Administración de Reglamentos y Permisos del Gobierno de Puerto Rico al Municipio de Carolina.

(12) La Asamblea Municipal de Carolina aprobó el Plan de Ordenación Territorial el 18 de diciembre de 1992 mediante la Ordenanza Núm. 43, Serie 1992-93-51, y la Junta de Planificación lo aprobó el 28 de diciembre de 1992 por conducto de la Resolución Núm. JP-PT-20-1. El 16 de julio de 1999 la Asamblea Municipal de Carolina aprobó una revisión parcial de su Plan de Ordenación Territorial, la cual fue ratificada por la Junta de Planificación el 21 de diciembre de 2000 mediante la Resolución Núm. JP-PT-20-2. El 21 de marzo de 2006 se realizó una revisión integral al Plan de Ordenación Territorial, la cual fue suscrita por la Legislatura Municipal y el Alcalde de Carolina por medio de la Resolución Núm. 51, Serie 2005-2006-57, y adoptada por la Junta de Planificación el 13 de diciembre de 2006 mediante la Re-solución Núm. JP-PT-20-5.

(13) Reglamento Núm. 4794, Departamento de Estado, 28 de septiembre de 1992.

(14) El reglamento enmendado llevó el mismo título y número que la Junta de Planificación le asignó al anterior, pero al ser promulgado por el Departamento de Estado el 14 de enero de 1993, se le designó como el Reglamento Núm. 4867.

(15) Reglamento Núm. 6283, Departamento de Estado, 3 de enero de 2001.

(16) Reglamento Núm. 6992, Departamento de Estado, 24 de junio de 2005.

(17) Tal y como mencionáramos, mediante la reforma a los procesos de permisos que introdujo la Ley 161 la JACL desapareció y fue sustituida por la Junta Revisora como organismo revisor administrativo.

(18) Véase, por ejemplo, a Granados v. Rodríguez Estrada I, 124 D.P.R. 1, 19 (1989), citando a RN.P. v. Rodríguez Estrada, Pres. C.E.E., 123 D.P.R. 1, 30-31 (1988), en el que expresamos:
“ ‘Téngase en mente que el Art. 1.016 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3016a, le impone la obligación al Tribunal Superior de celebrar vista en su fondo, recibir evidencia y hacer sus propias determinaciones de hecho y conclu-siones de derecho al revisar las decisiones de la C.E.E. No se trata, por lo tanto, de una mera revisión limitada a cuestiones de derecho. Se trata en realidad de un juicio de novo’

(19) Algunos de los fundamentos utilizados por la OMPU para sustentar su determinación inicial no fueron los más adecuados, puesto que basó su determina-ción esencialmente en los criterios aplicables a los Distritos R-3. No obstante, valién-dose del procedimiento del juicio de novo, la OMPU tuvo disponible una segunda oportunidad de presentar fundamentos válidos en derecho en los cuales basar su determinación.

(20) Para llegar a su determinación, la JACL utilizó el Reglamento de Lotifica-ción y Urbanización, Reglamento Núm. 6992, supra.

(21) A estos efectos, mediante un análisis somero constatamos que la estructura proyectada de dieciséis mil ochocientos pies cuadrados (16,800 p2), sobrepasa los límites de área de ocupación y área bruta de piso fijados para desarrollos en predios calificados como Distrito C-6.

(22) El Artículo 7 de la Ley Núm. 25 de 8 de junio de 1962 (23 L.P.R.A. sec. 30g) establece que las facilidades vecinales deben ajustarse a las necesidades de los resi-dentes que han de servir. Sin duda alguna, los entes estatales y municipales encar-gados de otorgar autorizaciones y permisos de índole territorial tendrán que llevar a cabo una evaluación cuidadosa para determinar lo que es necesario para cada *828 comunidad. Es decir, más allá de los requisitos objetivos ■ — como, por ejemplo, los atinentes a altura, patios y rotulación— las disposiciones estatutarias y reglamen-tarias aplicables a los predios destinados para servicios vecinales, exigen una eva-luación subjetiva de múltiples factores con el fin de determinar cuán adecuado es el proyecto propuesto para satisfacer las necesidades de dicha comunidad.

(23) En específico, el área de ocupación y área bruta de piso del Sizzler es de 581.13 m2 y el de Wendy’s es de 342.07 m2, mientras que las del proyecto propuesto es de 1580 m2.